**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KEISHA REYNOLDS, *Plaintiff*, v. HNS MANAGEMENT CO., INC., *Defendant*. | No. 3:20-cv-00471-MPS |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Keisha Reynolds brings this action against her former employer, HNS Management Co., Inc., d/b/a CTTRANSIT ("CT Transit"), alleging that CT Transit discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. ECF No. 14 at 7, 10-11. Reynolds, who was allegedly terminated after she refused to attend a fitness for duty examination, claims that CT Transit discriminated against her based on her religion and a perceived mental disability by requiring her to attend multiple fitness for duty examinations and by terminating her when she failed to attend one of those examinations. *Id.* at 10-11. CT Transit moves for summary judgment on all of Reynolds's claims. For the reasons set forth below, I grant CT Transit's motion for summary judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from CT Transit's Local Rule 56(a)1 statement, the evidence in the record, and any factual allegations from the operative complaint that are based on personal knowledge.[1]

---

[1] Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement that contains separately numbered paragraphs corresponding to the paragraphs set forth in the moving party's Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party in each paragraph. D. Conn. L. Civ. R. 56(a)2. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3. In addition, the opposing party must submit a list of

1

### A.      Employment Background

CT Transit "operates local express bus services in the Hartford, New Haven and Stamford areas" and "employs approximately 1,240 full and part-time employees throughout Connecticut." CT Transit's Local Rule 56(a)1 Statement, ECF No. 93-2 ¶ 2. CT Transit employed Reynolds as a bus operator in the Hartford Division for approximately seven years before her employment ended. *Id.* ¶ 1. CT Transit's bus operators are employed "to safely operate transit buses on routes throughout the Greater Hartford area," *id.* ¶ 8, and "certain medical conditions, including mental disorders, may prevent a [b]us [o]perator from meeting the requirements of the position," *id.*; ECF No. 93-5 at 4. Bus operators "are required by Federal Motor Carrier Regulations (49 CFR 391.41 - 391.49) to have a Connecticut Commercial Driver's License." ECF No. 93-2 ¶ 5; ECF No. 93-3 ¶ 7. And holders of Commercial Driver's Licenses (CDL's) must "maintain an up-to-date Medical Examiner's Certificate." ECF No. 93-2 ¶ 6; ECF

---

additional facts not included in the movant's Local Rule 56(a)1 Statement that it contends "establish genuine issues of material fact precluding judgment in favor of the moving party." D. Conn. L. Civ. R. 56(a)2. Reynolds was informed of this requirement by CT Transit when CT Transit filed its motion for summary judgment. *See* Notice to Self-Represented Litigant Concerning Motion for Summary Judgment, ECF No. 94. I also explained the rules governing motions for summary judgment to Reynolds at a telephonic status conference before CT Transit filed its motion for summary judgment. ECF No. 90.

Reynolds has declined to file a memorandum in opposition to CT Transit's motion for summary judgment or a Local Rule 56(a)2 statement. Because Reynolds did not file any argument or evidence in response to CT Transit's motion for summary judgment, the facts in CT Transit's statement that are supported by admissible evidence, which include all the facts from CT Transit's statement set forth herein, are deemed admitted. D. Conn. L. Civ. R. 56(a)1. The facts are also drawn from the allegations asserted in the operative complaint, which Reynolds signed under penalty of perjury, ECF No. 14 at 6, to the extent that the allegations are based on Reynolds's personal knowledge, *see Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that a verified pleading that contains "allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *Lindsay v. Cook*, 3:19CV1486(JCH), 2021 WL 5827080, at *2 n.2 (D. Conn. Dec. 7, 2021) ("the facts are also drawn from the allegations asserted in [th]e Complaint . . ., which [plaintiff] certified under penalty of perjury were true and accurate, to the extent that the allegations are based on [plaintiff's] personal knowledge"). But I am "under no obligation . . . to perform an independent review of the record to find proof of a factual dispute if the non-moving party fails to designate specific facts showing a genuine dispute of material fact." *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (internal quotation marks omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment").

No. 93-3 ¶ 8. "When there is a concern about a Bus Operator's ability to safely operate a bus and perform the duties of the job because of a physical or mental health issue, CT Transit refers the employee for a fitness for duty evaluation." ECF No. 93-2 ¶ 9; ECF No. 93-3 ¶ 11.

### B.    Fitness for Duty Exams

Reynolds "completed a regular physical on or about December 27, 2016, which physical found that she was fit for duty and had no restrictions to her ability to operate a vehicle." Reynolds's Verified Complaint, ECF No. 14 at 7. "In or about October, 2018, [Reynolds] expressed . . . to her Union Representative" that "she believed she had been followed by car thieves in her home town of Vernon, who may be interested in stealing her newly purchased vehicle." *Id.* at 8. "Within a few days of this conversation," Reynolds's manager informed her that "she could not return to regular work until she completed another physical." *Id.* Reynolds's manager "refused to explain why" CT Transit wanted Reynolds to complete another physical. *Id.* Reynolds attended "the physical on November 30, 2018" and was found "fit to return to work." *Id.* Reynolds claims that the medical provider who conducted the physical told her that "she had [n]o restrictions" but that CT Transit and Reynolds's union "were 'against her.'" *Id.* After this physical exam, Reynolds returned to work until she took "an approved one-week vacation" on October 14, 2019. *Id.*

While Reynolds was on vacation, CT Transit's Director of Human Resources, Catherine Gray, was informed on October 18, 2019, that Reynolds "saw demons" and believed that "demons were coming out of the Transportation Supervisor[']s ears, that a Bus Operator had demons[,] and the company was controlled by Free Masons." ECF No. 93-2 ¶ 10; ECF No. 93-3 ¶ 12. After receiving this information, CT Transit became concerned "about [Reynolds's] ability to safely operate a bus and perform her job duties." ECF No. 93-2 ¶ 10; ECF No. 93-3 ¶ 12.

Reynolds returned from vacation on October 21, 2019, and was told she "could not return to her regular shift" until she met with Gray. ECF No. 14 at 8. Gray and Reynolds met that same day. ECF No. 93-2 ¶ 11; ECF No. 14 at 8-9. "[B]ased on the results of that communication," Gray told Reynolds that "she would be referred to the Employee Assistance Program for evaluation of her ability to safely perform the duties of a Bus Operator" and that Reynolds "would not be able to return to work until she was cleared." ECF No. 93-2 ¶ 11; ECF No. 93-3 ¶ 13. Reynolds claims that Gray "would not explain the reason" for the evaluation and that Gray told Reynolds she "had already completed and submitted paperwork on [Reynolds's] behalf seeking a leave from work under the Family Medical Leave Act." ECF No. 14 at 9. Reynolds also claims that Gray made the appointment for Reynolds, giving Reynolds the "date, time and address of the office" at which the evaluation was to take place but not telling Reynolds that the evaluation was "actually a mental examination." *Id.* After Reynolds was referred to the Employee Assistance Program ("EAP"), Gray received "additional information which confirmed" CT Transit's concerns about whether Reynolds "could safely operate a bus and perform her job duties based upon a possible mental disorder." ECF No. 93-2 ¶ 12; ECF No. 93-3 ¶ 14.[2]

When Reynolds arrived at her evaluation, "she learned for the first time that it was actually a mental examination" that was conducted by "Kerry L. Tuttle, LCSW." ECF No. 14 at 9. Reynolds also learned that Gray had scheduled her for three "hour-long examinations." *Id.* During the first examination, Tuttle primarily questioned Reynolds about "her religious beliefs and such beliefs' impact on her decision-making process." *Id.* After Reynolds's second examination, Reynolds claims that Tuttle told her that she "would not be required to attend

---

[2] As it is not clear what this "additional information" was, I do not rely on it in my analysis below.

another session" and gave Reynolds "a form declaring her fit to return to work." *Id.* Reynolds claims that she submitted this form to CT Transit through her union representative "on or about October 28, 2019." *Id.*

On October 30, 2019, Gray was advised that Reynolds "had signed a release to allow disclosure of information" related to her EAP referral. ECF No. 93-2 ¶ 13; ECF No. 93-3 ¶ 15. As part of this disclosure, Gray received a letter from the President and CEO of The Lexington Group. ECF No. 93-2 ¶ 13; ECF No. 93-6 at 2. The Lexington Group is CT Transit's "employee assistance provider." ECF No. 93-7 at 2. The Lexington Group letter stated that Reynolds "was seen for an evaluation on October 24th and October 29th, 2019," that she "declined to schedule any further sessions," and that she should "be seen by a psychiatrist for a fitness for duty evaluation." ECF No. 93-6 at 2.

After Gray received this letter, she scheduled Reynolds for "a fitness for duty examination with St. Francis Occupational Health for November 5, 2019, at 11:15 am." ECF No. 93-3 ¶ 16. Gray told Reynolds on October 30, 2019, that "prior to returning to work, she needed to attend a fitness for duty examination on November 5, 2019 that could be rescheduled if it was not convenient for her." *Id.*; ECF No. 14 at 9 (Reynolds alleging that "she received a call from Gray informing her that . . . she would . . . be required to attend another 'physical' with an unidentified doctor at St. Francis hospital in Hartford"). "Gray attempted to contact [Reynolds] by telephone to confirm her attendance at the November 5, 2019 examination but did not receive a response from [Reynolds]." ECF No. 93-2 ¶ 14; ECF No. 93-3 ¶ 16. Reynolds did not attend the November 5 fitness for duty examination or contact Gray about it. ECF No. 93-3 ¶ 17.

In accordance with "CT Transit's established policy and procedures," on November 11, 2019, Gray sent Reynolds a letter "informing her that she would be 'Medically Disqualified' if

she did not complete the fitness for duty examination on or before December 2, 2019." ECF No. 93-2 ¶ 16; ECF No. 93-7 at 2-3. Gray's letter also asked Reynolds to contact Gray "as soon as possible to schedule a new appointment with St. Francis." ECF No. 93-7 at 2. "Enclosed with the letter was a copy of the October 30, 2019 letter from [the Lexington Group] recommending the fitness for duty examination and [the] FMLA documents, including a Notice of Rights and Responsibilities and Certification of Health Care Provider, should [Reynolds] need a leave of absence under state or federal law." ECF No. 93-2 ¶ 16; ECF No. 93-7 at 4-11. The FMLA documents were partially filled out and did not constitute a completed FMLA leave application. *See* ECF No. 93-7 at 5-11; *see also id.* at 3 (Grey informing Reynolds in November 11, 2019 letter that although Reynolds had "not requested leave under the FMLA," Gray had "included the forms for your convenience in case you and your healthcare provider determine FMLA leave is needed"). Gray sent this letter via certified mail to Reynolds at P.O. Box 1711, Hartford, CT 06144-1711. ECF No. 93-7 at 2. After Gray sent this letter, Reynolds "did not contact" Gray and "did not submit a request for FMLA leave." ECF No. 93-2 ¶ 17; ECF No. 93-3 ¶ 19. Reynolds also did not reschedule or attend a fitness for duty examination. ECF 93-3 ¶ 19; ECF No. 93-8 at 2 (Gray writing in January 2020 that Reynolds had "not followed up with the physician at St. Francis" about her fitness for duty examination).

Gray sent a second letter to Reynolds on January 8, 2020. ECF No. 93-3 ¶ 20; ECF No. 93-8. In this letter, Gray informed Reynolds that "she was medically disqualified from employment as a Bus Operator and removed from the employee roster." ECF No. 93-3 ¶ 20; ECF No. 93-8 at 2. Gray also noted that CT Transit had not "received any additional information" from Reynolds after sending the November 11, 2019 letter. ECF No. 93-8 at 2.

Gray's second letter was also sent to Reynolds at P.O. Box 1711, Hartford, CT 06144-1711; the letter was returned to Gray as unclaimed on February 19, 2020. *Id.* at 4.

Reynolds claims that she filed a charge with the Equal Employment Opportunity Commission ("EEOC") "on or about October 30, 2019," that she stopped receiving paychecks in November 2019, and that she "never received any direct correspondence from any employee or agent" of CT Transit after filing the EEOC Complaint. ECF No. 14 at 10. She also claims that she "was never formally terminated, and never received a reason or explanation for said termination." *Id.* Finally, Reynolds claims that she was placed on FMLA leave "without [her] knowledge and consent." *Id.* at 2. Despite claiming that she never received any correspondence from CT Transit after filing her EEOC charge on October 30, 2019, Reynolds included with her original complaint part of Gray's November 11, 2019 letter. *Compare* ECF No. 1 at 75-83 (the second page of Gray's November letter, the Lexington Group letter, and the partially completed FMLA paperwork), *with* ECF No. 93-7 at 3-11 (same).

### C.   Procedural History

Reynolds filed this action pro se via a 138-page complaint on April 6, 2020. ECF No. 1. After Reynolds failed to file proof of service and I ordered her to show cause why this case should not be dismissed for failure to prosecute, ECF No. 8, she filed a letter, ECF No. 9, that I construed as a motion to appoint counsel, ECF No. 10. I granted this motion and appointed counsel to assist Reynolds in drafting an amended complaint and serving it on CT Transit. *Id.* I authorized the appointed counsel to continue representing Reynolds if he wished to after counsel completed his initial tasks. ECF No. 11. Through counsel, Reynolds filed an Amended Complaint on November 5, 2020. ECF No. 14. This complaint asserted claims under the ADA

and Title VII. ECF No. 14 at 10-11. After Reynolds's appointed counsel filed this complaint and

served it on CT Transit, he declined to continue representing Reynolds. ECF No. 17.

After CT Transit filed its answer, I held a telephonic status conference, ECF No. 41, and

then granted Reynolds's motion to appoint counsel for a mediation before a magistrate judge,

ECF No. 37. I again offered appointed counsel the opportunity to continue representing

Reynolds after the mediation if he or she desired to do so. ECF No. 37. Counsel declined to

represent Reynolds and instead withdrew from the bar of this Court. ECF No. 46. I appointed

new counsel for Reynolds, ECF No. 47, but that counsel moved to withdraw because Reynolds

"evidenced a complete lack of trust" in counsel and refused to "share information or cooperate,"

such that counsel could not "proceed to a mediation or settlement conference in any meaningful

manner." ECF No. 61 at 1; *see also* ECF No. 57 at 1 (Reynolds writing in a letter that appointed

counsel was "insensitive," showed "no remorse towards [Reynolds's] situation," and was

"badgering [Reynolds] with all these questions that are irrelevant"); ECF No. 63 at 1 (Reynolds

writing in another letter that "[t]he assigned pro bono [a]ttorney . . . was never working in [her]

favor" and that Reynolds "will 'never' get the representation [she] truly deserved from any

Attorney in the state of Connecticut").

After I granted this motion to withdraw, ECF No. 65, I appointed new counsel for

Reynolds to conduct a settlement conference but then vacated that appointment, ECF No. 72,

because appointed counsel had curtailed his legal practice to care for a seriously ill family

member, ECF No. 74 at 1. I then appointed new pro bono counsel for Reynolds to conduct a

settlement conference. ECF No. 77. When the settlement conference concluded, pro bono

counsel withdrew his appearance. ECF No. 87. Reynolds responded to this withdrawal by,

among other things, noting that she observed 75% of CT Transit employees with a symbol she

identifies as "meaning . . . freemason" "on their vehicle[s]" and that "[a] lot of fraudulent activity can easily be covered up to get rich dishonestly off the government, it takes a lot of team work to achieve this?" ECF No. 88 at 3.

I scheduled a telephonic status conference in this case after the settlement conference did not lead to a settlement. ECF No. 85. At the telephonic status conference, I discussed with Reynolds the rules governing motions for summary judgment and then set a briefing schedule. ECF No. 90. CT Transit timely filed its motion for summary judgment on July 22, 2022. ECF No. 93. CT Transit also filed on the docket copies of the required notice to self-represented litigant concerning motions for summary judgment, Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56. ECF No. 94.[3] Reynolds's response was due by September 7, 2022. ECF No. 97. Reynolds requested that I appoint counsel to assist her in opposing CT Transit's motion for summary judgment on July 29, 2022. ECF Nos. 95-96. I denied this request on August 3, 2022, because I could not conclude that her "'position was likely to be of substance.'" ECF No. 97 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).[4] Reynolds declined to respond to CT Transit's motion for summary judgment, instead writing that she needed help to prepare her motion for summary judgment and that she was "set up to fail."

---

[3] The notice to self-represented litigant advised Reynolds that CT Transit's summary judgment motion "MAY BE GRANTED AND YOUR CLAIMS MAY BE DISMISSED WITHOUT FURTHER NOTICE IF YOU DO NOT FILE PAPERS AS REQUIRED BY RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND RULE 56 OF THE LOCAL RULES OF CIVIL PROCEDURE, AND IF THE MOTION SHOWS THAT THE MOVANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW." ECF No. 94 at 2. It also advised Reynolds that she must file evidence, *id.*, and explained the process by which Reynolds must file her opposition to summary judgment, *id.* at 2-3.

[4] I also emphasized that the Second Circuit has made clear that before an appointment is even considered, the indigent person must demonstrate that she is unable to obtain counsel. *Saviano v. Local 32B-32J*, 75 Fed. App'x 58, 59 (2d Cir. 2003) (quoting *Cooper*, 877 F.2d at 173). Reynolds did not indicate that she made any attempts to procure counsel to assist her in opposing the motion for summary judgment. ECF No. 97. After I declined to appoint her counsel for the sixth time, Reynolds filed a letter on August 4, 2022, listing five attorneys that she claimed would not take her case. ECF No. 98 at 1-2. These attorneys were the same attorneys she claimed would not take her case when she initially sought counsel in 2020. *See* ECF No. 9 at 1 (listing the same five attorneys as ones that "did not take [her] case" when she first sought counsel). Reynolds did not, therefore, include any information about counsel she sought to assist her with her summary judgment response.

ECF No. 98. One week after her response was due, Reynolds filed a letter stating that she "cannot do [her] own motion for summary judgment" and that she was "still waiting to hear from the court what is their next step." ECF No. 99.

## II.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted). "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment

as a matter of law." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).[5]

## III.  DISCUSSION

Reynolds asserts that she "suffered adverse employment actions . . . under circumstances giving rise to an inference of discrimination based on a perceived mental disability" in violation of the ADA and that she has "suffered adverse employment actions, under circumstances giving rise to an inference of discrimination based on religion" in violation of Title VII. ECF No. 14 at 10-11. Specifically, she alleges that being "required as a condition of continued employment, to undergo repetitive and unnecessary physical and mental examinations by Gray, despite multiple clearances by all attending professionals" was discrimination under the ADA and that she was "subjected to a religiously hostile work environment as a result of the pervasive and severe nature of Ms. Tuttle's two mental examination[s'] focus on the role of her beliefs in decision-making" in violation of Title VII. ECF No. 14 at 10-11. I first address Reynolds's disparate treatment claims before discussing her hostile work environment allegation.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McMillan v. City of New*

---

[5] Although Reynolds is currently pro se, her amended complaint — the operative complaint and the only document she has submitted that is pertinent (because it is sworn) to the motion for summary judgment — was drafted by appointed counsel. I thus need not afford that document the special solicitude courts must show towards pro se filings. I have, of course, construed that document in the light most favorable to Reynolds, and no greater level of solicitude would affect the analysis or result here.

*York*, 711 F.3d 120, 125 (2d Cir. 2013) (quotation marks omitted). Under that analytical framework, the plaintiff "must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

Similarly, Title VII, as relevant here, provides that it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that . . . religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). Religious discrimination claims under Title VII are also "analyzed under the burden-shifting framework of *McDonnell Douglas*." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

### A.    Disparate Treatment Claim: Prima Facie Discrimination Case

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). Similarly, a prima facie case of religious discrimination under Title VII requires a plaintiff to show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Witek*

*v. City of New York*, 807 Fed. Appx. 52, 54 (2d Cir. 2020) (unpublished). CT Transit first focuses

on Reynolds's complaints about the fitness for duty evaluations, arguing that sending Reynolds

"for a fitness for duty evaluation . . . does not constitute an adverse job action" under the ADA

and Title VII. ECF No. 93 at 1. This argument assumes that Reynolds is challenging the fitness

for duty examinations as distinct adverse employment actions, which may be a fair reading of her

ADA claims. *Compare* ECF No. 14 at 2 (challenging "[h]arassment in the form of unnecessary

and continued medical and/or mental health evaluations") *and id.* at 10 ("The Plaintiff was

subjected to a religiously hostile work environment as a result of the pervasive and severe nature

of Ms. Tuttle's two mental examination[s'] focus on the role of her beliefs in decision-making"),

*with id.* at 11 ("The Plaintiff . . . suffered adverse employment actions [in violation of the ADA

in that she] was required as a condition of continued employment, to undergo repetitive and

unnecessary physical and mental examinations"). To the extent she is, I find that the record

suggests that the fitness for duty evaluations did form part of an adverse employment action.

"To qualify as an adverse employment action, the employer's action toward the plaintiff

must be materially adverse with respect to the terms and conditions of employment." *Davis v.*

*New York City Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (internal quotation marks

omitted). It must be "more disruptive than a mere inconvenience or an alteration of job

responsibilities." *Id.* (internal quotation marks omitted). "Examples of such a change include

termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices . . . unique to a particular situation." *Sanders v. New York City Human Resources*

*Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted).

CT Transit argues that "an employer's request that an employee submit to a fitness for duty examination does not constitute an adverse employment action under Title VII or the ADA" and cites several cases in support of this position. ECF No. 93-1 at 8. It is true that "several district courts in the Second Circuit have concluded that discretionary employee examination or testing requirements do not *by themselves* amount to adverse employment action for the purposes of federal employment discrimination and retaliation claims." *Larsen v. Berlin Bd. of Educ.*, 588 F. Supp. 3d 247, 258 (D. Conn. 2022) (emphasis in original). But many of these courts — including some of the same ones that issued decisions cited by CT Transit — have "left open the possibility that an employer may take adverse employment action if it abuses its discretion" in requiring fitness for duty examinations. *Id.* (cited by CT Transit, but holding that two employer-mandated mental health exams in close temporal proximity could constitute an adverse employment action for purposes of retaliation claim if laws and regulations were manipulated to retaliate against the plaintiff).

Other courts have noted that fitness for duty examinations accompanied by material consequences could constitute an adverse employment action. *See McNulty v. Cnty. of Warren*, 2019 WL 1080877, at *11 (N.D.N.Y. 2019) (fitness for duty exam, combined with involuntary medical leave pending outcome of exam, could amount to adverse employment action); *Manners v. New York State Dept. of Envt'l Conservation*, No. 14-CV-810, 2015 WL 4276465, at *12 (N.D.N.Y. July 14, 2015) (plaintiff plausibly alleged adverse employment action where fitness for duty examination was imposed as condition of return to work and plaintiff was required to exhaust one month's worth of sick pay). Indeed, several of the cases cited by CT Transit held that a fitness for duty examination did not constitute an adverse employment action *because* it was not accompanied by a material consequence. *E.g., Farina v. Branford Bd. of Educ.*, 458 Fed.

Appx. 13, 17 (2d Cir. 2011) (unpublished) (finding that two successive fitness for duty examinations did not constitute an adverse employment action when there "was no proof" that the evaluations "had any effect on the terms and conditions of [plaintiff's] employment") (internal quotation marks omitted); *Baum v. County of Rockland*, 337 F. Supp. 2d 454, 474 (S.D.N.Y. 2004), *aff'd sub nom. Baum v. Rockland County*, 161 Fed. Appx. 62 (2d Cir. 2005) (unpublished) (CT Transit cites appellate decision affirming district court's grant of summary judgment, but district court found a single fitness for duty exam "does not constitute an adverse employment action" when plaintiff remained employed until her retirement and was not placed on involuntary leave).

Here, Reynolds was referred for a mandatory physical exam by her supervisor in November 2018 and was found fit to work. ECF No. 14 at 8. Then on October 21, 2019, she was referred again for an "evaluation of her ability to safely perform the duties of a Bus Operator" and was told that she "would not be able to return to work until she was cleared." ECF No. 93-2 ¶ 11; ECF No. 93-3 ¶ 13. After her initial evaluation, Reynolds was referred again on October 30, 2019 for a fitness for duty examination with a psychiatrist. ECF No. 93-3 ¶¶ 15-16. Reynolds did not attend that fitness for duty examination. ECF No. 93-3 ¶ 17. Nor does she appear to have communicated with anyone at CT Transit after October 30, 2019. *See id.* ¶ 16-17 (Reynolds did not answer Gray's call to confirm Reynolds's attendance at the St. Francis examination or contact Gray about the St. Francis examination); *id.* ¶ 18-19 (after Gray sent Reynolds a letter on November 11, 2019 warning her she would be medically disqualified if she did not attend a fitness for duty exam, Reynolds "did not contact" Gray); ECF No. 93-8 at 2 (by January 8, 2020, CT Transit had not "received any additional information" from Reynolds after sending the

November 11, 2019 letter).[6]  Reynolds stopped receiving paychecks in November 2019. ECF No. 14 at 10. She was eventually "medically disqualified from employment as a Bus Operator and removed from the employee roster" on January 8, 2020. ECF No. 93-3 ¶ 20; ECF No. 93-8 at 1.

At this stage, I must construe the facts in the light most favorable to Reynolds and must resolve all ambiguities and draw all reasonable inferences against CT Transit, and I must keep in mind that "the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis*." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) (internal quotation marks omitted). I infer from the sequence of events recounted above — including Gray's statement on October 21, 2019 that Reynolds could not return to work until she was cleared — that Reynolds never returned to work for CT Transit after her initial referral on October 21, 2019 and was, in November, 2019, suspended without pay. When the record is construed in the light most favorable to Reynolds, CT Transit did more than just refer her to two successive fitness for duty exams. Rather, it also placed her on involuntary medical leave from October 21, 2019 to January 8, 2020, and over a month — and perhaps more — of this leave period was unpaid. The combination of involuntary unpaid leave and two successive fitness for duty exams is a material change to Reynolds's terms and conditions of employment sufficient to satisfy her *de minimis* burden to show that she suffered an adverse employment action. *McNulty*, 2019 WL 1080877, at *11 (fitness for duty exam,

---

[6] Although Reynolds alleges that she "never received any direct correspondence" from CT Transit after October 30, 2019, the record indicates that she did. ECF No. 1 at 75-83 (Reynolds's original complaint attaches the second page of Gray's November letter and some of the enclosures, and Gray's November and January letters were both sent to the same P.O box).

combined with involuntary medical leave pending outcome of exam, amounted to adverse employment action at prima facie stage of *McDonnell Douglas*).[7]

Because CT Transit has not challenged any other element of Reynolds's prima facie case with respect to her ADA and Title VII claims, I assume without deciding that Reynolds has met her burden of establishing a prima facie case of discrimination as to both claims and move on to the second stage of the *McDonnell Douglas* framework. *See Richardson v. Comm'n. on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008) ("We assume without deciding, as did the district court, that [plaintiff] has presented a prima facie case of disparate treatment and retaliation; we inquire only whether the plaintiff can prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.") (internal quotation marks omitted).

###    B.    Non-Discriminatory Reason

"Under *McDonnell Douglas,* once [a] plaintiff establishes a *prima facie* case, a presumption arises that his employer unlawfully discriminated against him . . . . To rebut this presumption, the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff." *Mandell*, 316 F.3d 368, 380 (2d Cir. 2003) (internal quotation marks and citation omitted). At this stage, I must determine whether CT Transit has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original); "the determination that a defendant has met its

---

[7] CT Transit also argues that the "request that [Reynolds] participate in a fitness for duty examination does not constitute an adverse job/employment action under Title VII or the ADA because" the request was justified based on the facts known to CT Transit at the time of the request. ECF No. 93-1 at 8-9. These arguments are relevant to CT Transit's motive for referring Reynolds for fitness for duty exams and placing her on involuntary medical leave, not to whether these steps constituted an adverse employment action. I thus do not address these arguments here but instead address them below.

burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment," *id*. CT Transit has met this burden here.

CT Transit's bus operators are employed "to safely operate transit buses on routes throughout the Greater Hartford area," ECF No. 92-3 ¶ 8, and "certain medical conditions, including mental disorders, may prevent a [b]us [o]perator from meeting the requirements of the position," *id.*; ECF No. 93-5 at 4. Bus operators "must not … suffer from conditions which cannot be controlled" and "conditions which must be controlled to ensure safe driving include . . . mental disorders." ECF No. 93-5 at 4. This requirement stems from state and federal law, as bus operators are governed by the Federal Motor Carrier Regulations. ECF No. 93-2 ¶ 5. These regulations require bus operators "to have a Connecticut Commercial Driver's License," *id.*, and to "maintain an up-to-date Medical Examiner's Certificate," *id.* ¶ 6. When CT Transit becomes concerned about "a Bus Operator's ability to safely operate a bus and perform the duties of the job because of a physical or mental health issue," it "refers the employee for a fitness for duty evaluation." *Id.* ¶ 9; ECF No. 93-3 ¶ 11.

In this case, CT Transit became concerned "about [Reynolds's] ability to safely operate a bus and perform her job duties," ECF No. 93-2 ¶ 10; ECF No. 93-3 ¶ 12, after learning on October 18, 2019, that Reynolds had said she "saw demons" and believed that "demons were coming out of the Transportation Supervisors ears, that a Bus Operator had demons[,] and the company was controlled by Free Masons," ECF No. 93-2 ¶ 10; ECF No. 93-3 ¶ 12. After speaking with Reynolds about these statements, CT Transit became more concerned and referred Reynolds to the Employee Assistance Program on October 21, 2019 "for evaluation of her ability to safely perform the duties of a Bus Operator." ECF No. 93-2 ¶ 11; ECF No. 93-3 ¶ 13. On October 30, 2019, CT Transit received a letter from the Employee Assistance Program to which

Reynolds was referred. ECF No. 93-2 ¶ 13; ECF No. 93-6 at 2. This letter stated that Reynolds was seen twice, that she declined to schedule any further counseling sessions, and that she should "be seen by a psychiatrist for a fitness for duty evaluation." ECF No. 93-6 at 2.[8] CT Transit scheduled Reynolds for a fitness for duty evaluation after receiving this letter and provided her with the date, time, and location of the evaluation. ECF No. 93-3 ¶ 16; ECF No. 14 at 9. Reynolds did not attend this evaluation. ECF No. 93-2 ¶ 15; ECF No. 93-3 ¶ 17. Nor did she respond to CT Transit's several attempts to contact her about rescheduling the evaluation or CT Transit's warning that if she did not complete a fitness for duty evaluation, she would be medically disqualified from working as a bus operator. ECF No. 93-3 ¶ 16 (CT Transit attempting to call Reynolds); ECF No. 93-7 at 2-3 (CT Transit sending letter dated November 11, 2019). After Reynolds failed to reschedule the fitness for duty evaluation for more than two months, CT Transit sent a second letter to Reynolds informing her that "she was medically disqualified from employment as a Bus Operator and removed from the employee roster." ECF No. 93-3 ¶ 20; ECF No. 93-8 at 2. This sequence of events — which demonstrates that Reynolds repeatedly declined to follow employer instructions to attend a fitness for duty evaluation or otherwise show that she was medically qualified to work as a bus operator — constitutes a legitimate, non-discriminatory reason for Reynolds's termination. ECF No. 93-1 at 10-12.

## C.    Pretext

Because CT Transit has produced evidence that it acted for a non-discriminatory reason, "the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real

---

[8] As I noted above, CT Transit also claims that it learned "additional information which confirmed" CT Transit's concerns about whether Reynolds "could safely operate a bus and perform her job duties based upon a possible mental disorder" after Reynolds was referred to the Employee Assistance Program. ECF No. 93-2 ¶ 12; ECF No. 93-3 ¶ 14. I do not factor this claim into my analysis because it is too vague to contribute to CT Transit's legitimate, non-discriminatory reason for medically disqualifying Reynolds and removing her from the employee roster.

reason for the adverse employment decision was discrimination." *Mandell*, 316 F.3d at 381. At the third prong, to "defeat summary judgment ... the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (alteration in original) (citation and internal quotation marks omitted). The admissible evidence must allow a reasonable jury to conclude that CT Transit's stated reason for medically disqualifying Reynolds and then removing her from the employee roster "was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original). Reynolds failed to contest CT Transit's Local Rule 56(a)1 statement and so all the facts in that statement supported by admissible evidence — including all the facts I have recounted above — are admitted. Nor has Reynolds submitted any evidence of her own except for her verified complaint. Based on this record, I find that no reasonable juror could infer that CT Transit's decision to medically disqualify and terminate Reynolds was discriminatory.

The record reflects that Reynolds was found fit for duty in December 2016, ECF No. 14 at 7, and then was found fit for duty again in November 2018 after she was referred for a physical because she told her union representative she had been followed by car thieves who "may be interested in stealing her newly purchased vehicle," *id.* at 8. It is undisputed, however, that on October 18, 2019, CT Transit's Director of Human Resources, Gray, received reports that Reynolds "saw demons" and believed that "demons were coming out of the Transportation Supervisors ears, that a Bus Operator had demons[,] and the company was controlled by Free Masons." ECF No. 93-2 ¶ 10; ECF No. 93-3 ¶ 12. After receiving these reports, Gray met with Reynolds. ECF No. 93-2 ¶ 11; ECF No. 14 at 8. CT Transit claims that it then referred Reynolds

to its EAP based on the reports that Reynolds saw demons and Reynolds's statements when she met with Gray, *see* ECF No. 93-2 ¶ 11; ECF No. 93-3 ¶ 13, because it was concerned about Reynolds's ability to safely operate a bus, ECF No. 93-3 ¶ 12. This referral was in accordance with CT Transit's policy of referring bus operators for fitness for duty evaluations when it becomes concerned about an operator's "ability to safely operate a bus and perform the duties of the job because of a . . . mental health issue." ECF No. 93-3 ¶ 11.

CT Transit told Reynolds she could return to work once "she was cleared" by the EAP. ECF No. 93-3 ¶ 13. Reynolds claims in her verified complaint that CT Transit would not explain why she was referred to the EAP and did not tell Reynolds that the evaluation was a mental examination, ECF No. 14 at 9. But the relevant question at this stage is "what '*motivated* the employer.'" *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, (1983)). Even when I credit these statements, no reasonable juror could infer from them that CT Transit's reason for referring Reynolds to the EAP and preventing her from working until she was cleared to safely operate a bus was discriminatory or based on animus about her religious beliefs or any disability. And there is no other evidence in the record that CT Transit's initial referral of Reynolds to the EAP was motivated by discrimination.

Reynolds attended two sessions with a counselor to whom she was referred by the EAP. ECF No. 93-6 at 2; ECF No. 14 at 9. Reynolds claims she was then told she "would not be required to attend another session" and given a form "declaring her fit to return to work," which she submitted to CT Transit "on or about October 28, 2019." ECF No. 14 at 9. But CT Transit submitted a letter from its EAP provider dated October 30, 2019, which confirms that Reynolds attended two evaluation sessions but that Reynolds "declined to schedule any further sessions"

and that Reynolds should "be seen by a psychiatrist for a fitness for duty evaluation." ECF No. 93-6 at 2.[9] After receiving this letter, CT Transit referred Reynolds for a fitness for duty examination with St. Francis Occupational Health. ECF No. 93-3 ¶ 16. It claims that it did so based on the recommendation of the EAP and the information it had received about Reynolds up to October 30, 2019. ECF No. 93-3 ¶ 16. Even if Reynolds did submit a form from the EAP declaring her fit to return to work based on the two sessions with an EAP-provided counselor, it is undisputed that CT Transit *also* received a letter from the EAP two days after the date on which Reynolds claims to have submitted her form stating that Reynolds should be seen by a psychiatrist for a fitness for duty evaluation. On this evidence, no reasonable juror could infer that it is more likely than not that CT Transit's referral of Reynolds for a fitness for duty examination at St. Francis was motivated by discrimination.

Reynolds did not attend the fitness for duty examination at St. Francis Hospital. ECF No. 93-3 ¶ 17. Nor did Reynolds respond to CT Transit's phone call or letter warning her that she would be medically disqualified and removed from the employee roster if she did not complete the required fitness for duty examination. *Id.* ¶ 17-19. CT Transit finally medically disqualified Reynolds and removed her from the employee roster after it had not received any information from Reynolds for over two months. *See* ECF No. 93-8 at 2.

As CT Transit notes, Reynolds has offered no evidence establishing that its "proffered legitimate, nondiscriminatory reason for termination" is pretextual. ECF No. 93-1 at 12. Further, there is no evidence in the record that anyone at CT Transit made remarks suggesting animus against Reynolds based on her religion or a perceived mental disability. Nor is there any

---

[9] Reynolds's decision not to respond to CT Transit's Local Rule 56(a)1 statement means that she admits that CT Transit received this letter and that the Employee Assistance Program recommended to CT Transit that Reynolds be evaluated by a psychiatrist. ECF No. 93-6 at 2; *see* ECF No. 93-2 ¶ 13.

evidence that Reynolds was treated differently from other similarly situated employees at CT Transit. Instead, the undisputed evidence shows that CT Transit first referred Reynolds to the Employee Assistance Program after being concerned by things Reynolds had said about demons and free masons, and then referred Reynolds for a fitness for duty evaluation at St. Francis based on Reynolds's comments and a recommendation from the EAP. CT Transit declined to have Reynolds return to work until cleared by these evaluations. And CT Transit ultimately medically disqualified and terminated Reynolds when she refused to attend the fitness for duty evaluation at St. Francis. Even viewing the record in the light most favorable to Reynolds, no reasonable juror could infer that it was more likely than not that CT Transit acted with discriminatory intent. Nor could a reasonable juror conclude that CT Transit's proffered explanation for Reynolds's termination — that it was legitimately concerned Reynolds was not able to safely operate a bus and terminated Reynolds when she would not attend a fitness for duty examination to assuage this concern — is pretextual. I thus grant summary judgment as to Reynolds's disparate treatment claims.

### D.   Hostile Work Environment

Finally, Reynolds also alleges in her complaint that she "was subjected to a religiously hostile work environment as a result of the pervasive and severe nature of Ms. Tuttle's two mental examination[s'] focus on the role of her beliefs in decision-making." ECF No. 14 at 10. While Reynolds's other discrimination claims "may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analy[z]es a workplace environment as a whole to discover whether it is abusive." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d. Cir. 2001) (internal quotation marks omitted).

A hostile work environment claim requires a showing "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). A plaintiff must demonstrate "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* at 373-74. "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (internal quotation marks omitted). And as a general rule, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*

Reynolds has failed to raise a genuine dispute of material fact as to her hostile work environment claim. The conduct she claims gives rise to a "religiously hostile work environment" is "Ms. Tuttle's two mental examination[s'] focus on the role of her beliefs in decision-making." ECF No. 14 at 10. Questioning an employee about her beliefs (religious or otherwise) is not a severe form of misconduct, and two such incidents, even when viewed together, are not pervasive enough to create an objectively hostile or abusive work environment. *See, e.g., Khan v. Fed. Reserve Bank of New York*, 02 CIV.8893(JCF), 2005 WL 273027, at *8 (S.D.N.Y. Feb. 2, 2005) (cartoon that "made fun of Muslims' clothing and beards" was "certainly not severe enough" to raise genuine dispute of material fact in support of hostile work environment claim); *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750

Fed.App'x. 41, 48 (2d Cir. 2018) (unpublished) (affirming summary judgement and finding that eleven incidents over a five-year period were not hostile or abusive); *Husser v. New York City Dept. of Educ.*, 137 F.Supp.3d 253, 259, 276 (E.D.N.Y. 2015) (granting summary judgment as to hostile work environment claim and finding "the twelve cited remarks and events over the course of a three-year period are not sufficiently pervasive"). Further, Reynolds alleges no remarks or other conduct that actually suggest religious bias or bias towards persons with disabilities.

Reynolds has also failed to show "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 372. Reynolds alleges that her hostile work environment claim arises only from the questions she was asked by Tuttle, the counselor she was referred to by the EAP. There is no evidence showing that the topics discussed in Tuttle's counseling sessions were connected in any way with Reynolds's workplace conditions such that her terms and conditions of employment were altered. Tuttle was not employed by CT Transit and the discussions with Tuttle occurred *after* Reynolds had already been removed from her workplace. I thus grant summary judgment as to the hostile work environment claim in the operative complaint.

**IV.    CONCLUSION**

For the reasons above, I grant the motion for summary judgment (ECF No. 93). The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        March 15, 2023